UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-10189-RGS

LIBERTY BAY CREDIT UNION,
Plaintiff and Counterclaim Defendant

v.

OPEN SOLUTIONS, INC.
Defendant and Counterclaimant

MEMORANDUM AND ORDER ON THE PARTIES'
CROSS-MOTIONS FOR SUMMARY JUDGMENT

November 21, 2012

STEARNS, D.J.

    In February of 2007, Liberty Bay Credit Union (Liberty Bay), a Massachusetts

chartered lending institution, hired I.A. Systems (IAS) to create a software interface

that would allow it to import client member information into automated loan

origination software.  In February of 2011, Liberty Bay brought this lawsuit against

Open Solutions, Inc. (Open Solutions), IAS's successor-in-interest, alleging, *inter*

*alia*,[1] breach of contract and breach of the implied covenant of good faith and fair

dealing. Open Solutions counterclaimed, asserting mirroring causes of action.

Presently before the court are the parties' cross-motions for summary judgment, as

---

[1] Liberty Bay's Complaint also contained claims for unjust enrichment and violations
of Mass. Gen. Laws ch. 93A, § 11.  Those claims were dismissed by order of the court
on September 7, 2011.  Dkt # 26.

well as Open Solutions' motion for partial summary judgment on the issue of damages.  A hearing on the motions was held on November 19, 2012.

BACKGROUND

The following material facts are not in dispute, or, where disputed, are taken in the light most favorable to the nonmoving party.  In 2006, Liberty Bay decided to automate its loan origination process to permit its customers to apply for and receive loan approvals online, and to allow it to price these loans using a risk-based pricing model.[2]  IAS held itself out as an expert developer of proprietary loan origination software, and in particular, StreamLend Velocity (Velocity), a "paperless, end-to-loan origination software system that . . . provide[s] financial institutions with the ability to automate their entire lending process."  Pl.'s Ex. 11.  As touted, Velocity pulls credit ratings of loan applicants and analyzes their financial information according to a lender's preferred decision rules.  Credit  applicants using Velocity are able to obtain loan approvals entirely online.  By interfacing Velocity with Liberty Bay's core processing or "host" system software, XP Systems' XP2, the combined platforms would (or so it was planned) import credit union members' demographic profiles from the host system for analysis and then automatically book any approved loan for

_____

[2] Risk-based pricing is a methodology used in the mortgage lending industry to set interest rates by integrating the time value of money with factors predicting the probability of a borrower's default.

2

servicing through XP2.[3]

Liberty Bay and IAS entered into an End User Product License Agreement (the Agreement) on February 16, 2007.  The Agreement granted to Liberty Bay "a non-exclusive, non-transferable license to use the Product and any Enhancements to which End User is entitled . . . ."  Agreement § 2.1(i).  "Product" was defined to mean "StreamLend Velocity loan origination software programs in machine readable code, together with the options and modules set forth in Schedule I." *Id.* § 1.1(d).  Schedule I identified the software features to be licensed and, under the heading "Interfaces," listed the "XP Host Interface," the bidirectional interface that was to import data from XP2 into Velocity and then upload data from Velocity to XP2.  *Id.* Schedule I.  The Agreement provided that

> [i]n the event that [IAS] fails to make an interface that performs all of the functions contemplated [by the Agreement] on or before January 1, 2008, through no fault of End User or any Third Party that is engaged by End User to perform services or provide products, [End User] will have the option to cancel the project and receive a full refund or continue to move forward with the implementation of StreamLend Velocity.

*Id.* (Refund provision).  IAS further warranted that "the product . . . is free from any defects and will perform in accordance with the Documentation . . . and will not fail or cease to operate or provide erroneous results."  *Id.* § 8.1.

---

[3] The XP2 software manages Liberty Bay's general ledger.  It facilitates customer account activities, such as the opening and closing of accounts, the processing of deposits and withdrawals, tracking of balances, and servicing loans.

The Agreement laid out specific obligations of the parties with regard to the development of the XP Interface.  It stated that "IAS is responsible for developing, testing and implementing software program(s) according to specifications provided by End User within the schedule mutually agreed to by IAS and End User."  *Id.* Schedule III, Section C; *see also id.* § 6.5(b).  Liberty Bay, for its part, was to provide "facilities, specifications, support and testing to allow IAS to develop the required interfaces," *id.* § 6.5(a), including "detailed technical and business specifications . . . for any interfaces to third party systems within two weeks of contract signing," *id.* Schedule III, Section C.  Liberty Bay was also required to provide "detailed instructions in writing for required transactions and host fields for booking loans for up to twenty loan products on the host system through the IAS interface within two months of contract signing."  *Id*.  The Agreement stipulated that "[d]elays in providing the specifications will result in delays in the development and delivery of the interface(s) to the End User, which will not impact End User acceptance of the system."  *Id*.

Upon execution of the Agreement, Liberty Bay paid an initial deposit of $113,733.00, equal to 50% of the "Lending Solution Total."[4]  It failed, however, to

---

[4] The Agreement contained the following payment schedule:

| Amount | Value | | Due |
|--------|-------|--|-----|

provide IAS with the XP Interface specifications within the required two weeks.  Nor did it meet its obligation to provide instructions for the required transactions within the two months specified in the Agreement.  Notwithstanding these failures, Open Solutions scheduled a "kick-off" meeting for September 24, 2007, at which time it installed Velocity on a Liberty Bay server.  In December of 2007, Open Solutions conducted a "Super User" training program for Liberty Bay employees.  Although Liberty Bay did not pay the annual maintenance fee or the training fee that were due under the Agreement, *see supra* note 4, Open Solutions continued working towards

| $113,733 | 50% of the Lending Solution Total | Upon Signing of End User Product License Agreement |
| $43,274 | 100% 1st Year Maintenance Fees | Upon Installation of Servers at Client Site |
| $90,986 | 40% of Lending Solution Total | Upon Completion of Super User Training |
| $22,746 | 10% Balance | Upon Completion of End User Training |

Agreement Schedule I.  Each subsequent annual maintenance fee was to be "paid annually thirty (30) days prior to the maintenance effective date."  *Id.* Schedule II. The Agreement further provided that "any additional hardware, software, or service that is not included in the original agreement cost will require an 80% deposit prior to ordering and/or implementing, with the balance due upon delivery."  *Id.* Schedule I.

a "go-live" date of April 14, 2008.

On December 26, 2007, Open Solutions sent to an email to Liberty Bay listing the tasks that Liberty Bay needed to complete in January and February if Velocity was to be up and running by the April go-live date.  As of the end of February, Liberty Bay had failed to complete the scheduled tasks.  Open Solutions also sent Liberty Bay a questionnaire in January seeking the specifications required to build the XP Interface.  When in March, Open Solutions had not been provided the specifications, it sent Liberty Bay a revised project plan with a deferred go-live date of July 1, 2008.

For reasons that are unclear (and disputed by the parties), the July go-live date was subsequently pushed back to December of 2008.  Open Solutions meanwhile proceeded with the building of the XP Interface.  To perform acceptance testing, Open Solutions required access to the APEX license keys that permitted the Liberty Bay server hosting Velocity to communicate with the server hosting Liberty Bay's XP2 software.  XP Systems, however, balked at providing Open Solutions with the APEX license keys before (and unless) Liberty Bay entered into a new sales quote agreement (which did not happen until October 3, 2008).[5]

---

[5] Liberty Bay mildly disputes Open Solutions' contention that access to the APEX license keys was somehow contingent on the execution of the sales quote agreement, but argues that, in any event, Open Solutions was unready to conduct testing before October of 2008.

In October or November of 2008, after the APEX license keys issue was finally resolved, the XP Interface developed by Open Solutions was delivered to Liberty Bay for acceptance testing.  It immediately experienced problems.  When these persisted,[5] the go-live date was delayed again, now to February of 2009.

As the February date drew near, the XP Interface was still experiencing importing and uploading errors.  Open Solutions spent most of March attempting to correct the flaws in the XP Interface.  However, in early April of 2009, when Open Solutions attempted to demonstrate the supposedly perfected XP Interface for Liberty Bay's president, it again crashed.  Liberty Bay responded with a letter stating that because Open Solutions "ha[d] failed to deliver a functional bi-directional interface as contemplated by the Agreement, [Liberty Bay] ha[d] not been able to use the SteamLend Velocity software to perform the functions that [Liberty Bay] entered into the Agreement to achieve."  Pl.'s Ex. 20.  Invoking the Agreement's Refund provision, Liberty Bay demanded the return of its down payment.  In reply, Open Solutions contended that the delays in implementation of the XP Interface had been caused "by Liberty Bay and/or XP [Systems], Liberty Bay's third party."  Def.'s Ex. V.  Open Solutions refused to refund the deposit and sought Liberty Bay's

---

[5] Open Solutions does not dispute the faulty performance of the XP Interface, but blames it on XP Systems' failure to provide it with all the information it needed to satisfactorily complete the coding.

"cooperation so that [Open Solutions] may successfully implement the interface." *Id.*

Despite the seeming finality of its April 6, 2009 letter, Liberty Bay continued to collaborate with Open Solutions throughout the remainder of 2009. In September of that year, Open Solutions conducted the End User Training for Liberty Bay employees in anticipation of the system going live. However, the XP Interface continued to operate erratically, if at all. Open Solutions blames the glitches on the XP Systems software, and XP Systems' failure to make a patch available before October of 2009. But even then, the XP Interface continued to generate errors. (Open Solutions concedes as much, but argues that the errors were not significant or material).

In January of 2010, with the go-live date now postponed until March, the test server at Liberty Bay crashed. The server was beyond repair, and certain data, including the tweaked Velocity, was lost. Liberty Bay did not have a backup of the data, and the only compilation Open Solutions had available was more than a year old and did not include the customizations and enhancements that had been made during 2009.

In May of 2010, Open Solutions sent Liberty Bay a demand letter stating that it would not resume work without payment of some or all of the monies that Open Solutions claimed were due under the Agreement. Open Solutions contends that

shortly after the January server crash, Liberty Bay informed its employees that the project was dead, although it did not formally communicate that decision to Open Solutions until November of 2010, when it sent a letter "re-stating and re-deliver[ing]" its April 6, 2009 letter terminating the Agreement.  Def.'s Ex. DD.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986).  A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue as to a material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  To oppose the motion successfully, the non-moving party "may not rest upon the mere allegations or denials of his pleading . . . ."  *Anderson*, 477 U.S. at 256.  Rather, the non-movant must submit "'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'"  *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993), quoting *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975).  On cross-motions for

9

summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn." *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997).

Breach of Contract[6]

Liberty Bay contends that it is entitled to a refund of the monies it paid because Open Solutions failed to provide an integrated product successfully implementing a system of automated loan approval and risk-based mortgage pricing.  It also seeks damages for breach of contract based on Open Solutions' failure to satisfy the Agreement's express warranty and its concomitant obligation to implement the XP Interface.  Opens Solutions counters with its own claim for breach of contract based on Liberty Bay's refusal to pay the remaining installments under the Agreement.  In this regard, Open Solutions argues that: (1) Liberty Bay waived any right that it may have had under the Agreement to demand performance by January 1, 2008; (2) even if the January of 2008 deadline had not been waived by Liberty Bay, the demand for a refund is contractually barred because Liberty Bay and XP Systems were at least partially responsible for the delay; and (3) the Refund provision of the Agreement on which Liberty Bay relies was merely an "option" that Liberty Bay forfeited when it chose to go forward with the project.

---

[6] The Agreement by its express terms is governed by New York law.

Open Solutions' waiver argument is correct to this extent: by failing to provide the XP System specifications and the transactions instructions within the time frame set out in the Agreement and by tacitly acquiescing in the serial delays of the go-live date, Liberty Bay waived its right to demand performance by the originally agreed date of January 1, 2008.[7]  *See Golfo v. Kycia Assoc., Inc.*, 845 N.Y.S.2d 122, 124 (N.Y. App. Div. 2007) (a waiver of an express contractual right may arise by "such conduct or a failure to act as to evince an intent not to claim the purported contractual advantage"), citing *Hadden v. Consol. Edison Co. of N.Y.*, 45 N.Y.2d 466, 469 (N.Y. 1978); *see also S.W. Bridges & Co. v. Barry*, 142 N.E. 664, 665 (N.Y. 1923) (noting that while waiver is ordinarily a question of fact, it may be found as a matter of law where "[t]he facts [are] clear and bear but one interpretation").  The waiver of the January 1, 2008 deadline, however, does not answer Liberty Bay's contract claim. The claim does not rely on Open Solutions' failure to perform by January of 2008, but on its failure to complete satisfactory performance *at any time*.

It is a settled principle of law that the time for performance required by a contract may be extended by subsequent agreement of the parties or may be implied from their acts.  *See Fundamental Portfolio Advisors v. Tocqueville Asset Mgmt.*, 850 N.E.2d 653, 658 (N.Y. 2006).  Liberty Bay's decision to continue working with Open

---

[7] Liberty Bay denies that its own failure to perform could be found to have contributed to the delay.  The court disagrees.

Solutions after the January 1, 2008 deadline expired constituted an election by Liberty Bay to extend the time for Open Solutions to perform.  But while the length of that extension was not specified, it was not indefinite.  Liberty Bay's April 9, 2009 termination letter effectively served notice that its waiver of the deadline was being withdrawn.  *See Island Estates Mgmt., Inc. v. MBA-Manorhaven, LLC*, 2008 WL 4700416, at *8 (N.Y. Sup. Ct. Oct. 10, 2008).  From that point forward, Liberty Bay was obligated to allow Open Solutions a reasonable amount of time, and no more, for completion of performance under the remaining terms of the Agreement.  *Id.*; *see also Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1270 (N.Y. 1982) ("A waiver . . . can . . . be withdrawn, provided the party whose performance has been waived is given notice of the withdrawal and a reasonable time after notice within which to perform." (citation omitted)).

The court concludes as a matter of law that Open Solutions exceeded any reasonable allowance of additional time to perform when it failed to meet the final go-live date in March of 2010.  Open Solutions had agreed to that date, indicating its commitment to have the interface ready no later than March.  It was not to be.[8]  Nor is there any heft to Open Solutions' argument that Liberty Bay was contractually

---

[8] Open Solutions' contention that it was fully prepared to go live as early as January of 2010 is not supported by the undisputed record of subsequent events and is contradicted by Open Solutions' argument that Liberty Bay was itself at least partially at fault for the system's continuing failures.

barred from demanding a refund because Open Solutions' inability to meet the deadline was caused at least in part by the failure of Liberty Bay and XP Systems to comply promptly with Open Solutions' requests for information.  Even granting that Liberty Bay failed to provide the specifications and instructions in a timely fashion, and that Open Solutions was unable to obtain an APEX key license until Liberty Bay and XP Systems negotiated a purchase order in October of 2008, and that XP Systems did not correct issues with the XP software until October of 2009, Open Solutions had still not delivered a functioning product as late as March of 2010.  Open Solutions claims that "the failure [in March of 2010] to 'go live' was the result of the Liberty Bay's own server crash – not any failure by Open Solutions to perform its obligations under the Agreement."  Def.'s Opp'n at 16.  The implication of the argument  – that Liberty Bay was responsible for backing-up Open Solutions' coding of the interface – is unsupportable.  Not only is it reasonable to expect a software development company to maintain a current backup of its programming, the Agreement expressly required Open Solutions to do so.  Agreement § 14.1 (requiring Open Solutions to "maintain on deposit . . . a then-current copy of . . . the Source Code, including any modification made for the End User by IAS").

Nor is the court persuaded that Liberty Bay forever forfeited its right to seek a refund by attempting to salvage the project despite the lapse of the January 1, 2008

deadline.  Open Solutions' reliance on *Bigda v. Fischbach Corp.*, 849 F. Supp. 895 (S.D.N.Y. 1994), is misplaced.  In *Bigda*, the court held that "[t]he power to terminate a contract following a breach is one of election requiring a choice between two inconsistent remedies available for the redress of a wrong. . . . If the non-breaching party elects to continue performance, he may not later choose to terminate the contract on account of the breach."  *Id.* at 901 (internal citations omitted).  The court noted, however, that the plaintiff had alleged various breaches of his employment contract, and that while he had "clearly overlooked any breaches during the [earlier] era and elected to continue to enjoy the benefits of the [contract]," his "election to continue his contract following the [earlier] era breaches would not necessarily prevent a subsequent termination if new breaches arose during the [later] era."  *Id.*, citing *Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir. 1969).  Consistent with the full holding of *Bigda*, Liberty Bay's decision to waive the January 1, 2008 breach by Open Solutions did not forfeit its right to object to subsequent breaches of the same term (as modified by the parties).

Responding to Liberty Bay's claim that Open Solutions breached the terms of the express warranty and its obligation to implement the XP Interface, Open Solutions first objects that these claims are not properly before the court because Liberty Bay failed to include them in the Complaint.  It argues that the only portion of the

Agreement that is referenced in the Complaint is the Refund provision.  *See* Compl. ¶ 9.  Open Solutions' reading of the Complaint, however, is unduly selective.  The Complaint more broadly alleges that Open Solutions failed to provide a functioning integrated product and that this failure justified the demand for a refund.  *See* Compl. ¶¶ 6, 11, 14, 15, 23.  Moreover, in its prayer for relief, the Complaint expressly states that Liberty Bay is seeking both "a full refund . . . [and] compensation for its damages."  Compl. ¶ 18.  To perfect its breach of contract claim, Liberty Bay was not obligated to incant the word "warranty" or regurgitate the exact wording of the breached provision of the Agreement.[9]  *See Rasheed v. D'Antonio*, 2011 WL 4382097, at *20 (D. Mass. Aug. 1, 2011) (noting that dismissal for failure to comply with Rule 8 pleading requirements "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised" (internal quotation marks and citation omitted)).

Open Solutions next argues that even if properly pled, Liberty Bay's breach of contract claims fail because any nonperformance on its part was excused by Liberty Bay's failure to pay the more than $430,000 in annual maintenance, support, and

---

[9] Open Solutions' reliance on *Brady v. Lynes*, 2008 WL 2276518 (S.D.N.Y June 2, 2008), in support of its argument that the breach of warranty claim was insufficiently pled is unavailing.  In *Brady*, the court dismissed a breach of warranty claim where the complaint failed to plead the existence of any agreement or duty that could form the basis of a warranty.  *See id.* at *3, *11-12.  *Brady* has no application here, where the Complaint is based on an Agreement that contains an express warranty provision.

other services that Open Solutions claims is due, and that it should have summary judgment on this issue.  To this extent Open Solutions is correct: Liberty Bay's argument that it was excused from making additional installments because the project never went live is not supported by the plain language of the Agreement.  It clearly contemplated that payments would come due *prior* to the go-live date.  Be that as it may, Open Solutions, like Liberty Bay, gave its tacit approval to the extension of the time for payment when it continued to work without being paid.  *See Golfo*, 845 N.Y.S.2d at 124.  It is certainly the case, as Open Solutions notes, "that a party to an agreement who believes it has been breached may elect to continue to perform the agreement rather than terminate it, and later sue for breach." *Nat'l Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 675 (S.D.N.Y. 1991).  But, as the court in *Nat'l Westminster Bank* continued, "this is true . . . only where notice of the breach has been given to the other side." *Id.* (citations omitted).  It is undisputed that Open Solutions sent Liberty Bay invoices at regular intervals.  However, there is no evidence in the record that it ever put Liberty Bay on notice that it was continuing the work under protest, *see Nassau Trust Co.*, 436 N.E.2d at 1270, much less that it considered Liberty Bay to be in breach of its payment obligations.  The first peep on the subject from Open Solutions was not heard until May of 2010, when Open Solutions got around to serving a demand letter for payment on Liberty Bay.  Having

waived performance until well after it had terminally breached the Agreement, Open

Solutions is now precluded from asserting Liberty Bay's failure to pay as an excuse

for its own nonperformance.  *See id.*, citing *Helsmley-Spear, Inc. v. Westdeutsche*

*Landesbank Girozentrale*, 692 F. Supp. 194, 204 (S.D.N.Y. 1988); Rstmt. Contr. §

237.

Open Solutions finally asserts that excuse or not, "Liberty Bay has no basis to

claim that Open Solutions ever breached *any* of its contractual obligations."  Def.'s

Opp'n at 2.  What Open Solutions has in mind is an elaborate argument that the

warranty applies only to "the product," Agreement § 8.1, the definition of which does

not include the XP Interface, *see* Agreement Schedule I.A (separately listing

"Licensing" and "Interfaces"); that even if the warranty was construed to include the

XP Interface, errors occurring during its testing cannot logically amount to a breach

of that warranty; and that "errors" occurring during the testing phase do not amount

to "defects" as that term is ordinarily understood (it is not clear by whom).[10]  It also

---

[10] Open Solutions also contends that Liberty Bay failed to provide adequate notice of the alleged breach of warranty as required by the New York Uniform Commercial Code, N.Y. U.C.C. § 2-607(3)(a).  Even assuming that the U.C.C. applies (I do not believe that it does, *see Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 742-743 (2d Cir. 1979) ("A contract is for services rather than sale when service predominates and the sale of items is incidental." (internal quotation marks and citation omitted))), Open Solutions cannot credibly claim that it was unaware that Liberty Bay found the work unsatisfactory when it repeatedly put Open Solutions back to the task of correcting the errors uncovered during the testing.

attacks Liberty Bay's "failure to implement" claim on the specious ground that "implementing" does not require that the interface actually work, but only that Open Solutions "devote resources to building and developing the XP Interface," which it did.

The arguments on these points, whether interesting or not, are academic because however many were the provisions of the Agreement breached by Open Solutions, Liberty Bay's recovery is limited to a refund of monies paid. Liberty Bay's claim for "lost profits" and "lost employee time" fails under the longstanding rule that limits contract recovery to direct damages save in those instances in which liability for consequential damages is contemplated by the parties (or should reasonably have been so) at the time the contract was entered. *See Hadley v. Baxendale*, 9 Ex. 341, 354, 156 Eng. Rep. 145, 151 (1854). In this case, consequential damages are barred by the terms of the Agreement and, in any case, are unduly speculative, and therefore unrecoverable. *See Howard v. Stillwell & Bierce Mfg. Co.*, 139 U.S. 199, 206 (1891); *see also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 519 (S.D.N.Y. 2011) ("Lost profits may be recovered only if: (1) lost profits were 'fairly within the contemplation of the parties to the contract at the time it was made;' (2) lost profits were caused by the defendant's breach; and (3) damages are 'capable of proof with reasonable certainty.'" (quoting *Kenford Co. v. Cnty. of*

*Erie*, 493 N.E.2d 234, 235 (N.Y. 1986))).

The Agreement contains an express provision providing that Liberty Bay's "exclusive remedy for material breach of the limited warranty . . . shall be the total amount of fees paid by [Liberty Bay] pursuant to this agreement." Agreement § 9.1 ("End User Remedies"). The Agreement also provides that Open Solutions cannot be held liable to Liberty Bay for "incidental or consequential or any other damages whatsoever . . . arising out of the use of the Product," including "damages for loss of business . . . or other pecuniary loss." *Id.* § 9.2 ("Consequential Damages"). To be sure, the End User Remedies provision does not apply to damages arising from the separately alleged breach of the obligation to implement the interface. Nor would the Consequential Damages provision limiting Open Solutions' liability related to the functioning or "use" of the product appear to insulate it from damages claims based on its failure to initially furnish the product. *See PRO Net, LLC v. ACC TeleCom Corp.*, 741 N.Y.S.2d 795, 796 (N.Y. App. Div. 2002) (holding that "[a] provision limiting defendant's liability for interruption or failure of service does not unambiguously apply to the alleged failure in the first instance to deliver the [telecommunications service] facilities within a commercially reasonable period"). The Refund provision, however, clearly does apply to the exclusion of all other remedies. *See Matter of Westermoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352,

19

358 (N.Y. 2003) ("A written contract will be read as a whole, and every part will be interpreted with reference to the whole . . . . " (internal quotation marks and citation omitted)); *see also DynCorp. v. GTE Corp.*, 215 F. Supp. 2d 308, 317 (S.D.N.Y. 2002) ("Under New York law, sophisticated parties with equal bargaining power can agree to limit the liability that the other may recover from a breach of contract.").

Moreover, it is highly doubtful that Liberty Bay would be able to recover damages for lost profits and lost employee time even if it was not contractually barred from doing so. "Lost profits" (as Liberty defines them) is the difference between the mortgage interest rates it actually charged its customers and the higher rates it claims it could have charged its less credit-worthy members during the period when the risk-based pricing system was to have been in effect. Putting aside a jury's likely revulsion at a demand for damages based on Liberty Bay's loss of the opportunity to fleece the hardest pressed of its customers, that the strategy would have worked is speculative at best (it is not clear how Liberty Bay would propose to prove that its less affluent customers are as gullible as the argument supposes).[11]   *Cf. Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1070 (S.D.N.Y. 1996)

---

[11] It would seem self-evident that Liberty Bay did not have need of Velocity to charge borrowers higher interest rates, as all the software did was mechanically apply decision variables supplied by the bank to loan applications, something that could have been done (although perhaps not as quickly) by employees armed with pencils and hand calculators.

("To award plaintiff lost profits based on the unproven assumption that it would have sold at list price [all product] it had agreed to purchase would unjustly reward plaintiff rather than make it whole.").[12]

Breach of the Implied Covenant of Good Faith and Fair Dealing

Liberty Bay's claim for breach of the implied covenant of good faith and fair dealing is precluded by the controlling law.[13]  "Under New York Law, a claim for breach of an implied covenant of good faith and fair dealing does not provide a cause of action separate from a breach of contract claim." *Atlantis Info. Tech., GmbH v. CA, Inc.*, 485 F. Supp. 2d 224, 230 (E.D.N.Y. 2007); *see also Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) ("[P]arties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." (internal quotation marks and citation omitted)).  Liberty Bay's claim for breach of the implied covenant is premised on Open Solution's "fail[ure] to perform obligations under the License Agreement" and its "fail[ure] and

---

[12] Liberty Bay's "lost employee time" damages claim merits even shorter shrift. Liberty Bay calculates this "loss" as an estimate of the time that six of its employees spent working on the Velocity project.  Liberty Bay admits, however, that it would have paid these employees' salaries whatever assignment they were given during the relevant period.

[13] Open Solutions agrees in its opposition to Liberty Bay's claim.  Def.'s Mot. at 18. Under the well-established legal principle that what is good for the gander is good for the goose, Open Solutions' reciprocal good faith claim against Liberty Bay will also be dismissed.

refus[al] to refund payments made by Liberty Bay," Compl. ¶ 27 – the same conduct that serves as the predicate for its breach of contract claim.[14]  The claim will therefore be dismissed as redundant.  *See Atlantis Info. Tech., GmbH*, 485 F. Supp. 2d at 230.

ORDER

For the foregoing reasons, Open Solutions' motion for summary judgment on its breach of contract claim is <u>DENIED</u>.  Open Solutions' motion for partial summary judgment on the issue of damages is <u>ALLOWED</u>.  Liberty Bay's motion for summary judgment is <u>ALLOWED</u> with respect to its breach of contract claim based on Open Solutions' refusal to refund the monies paid.  The motion is otherwise <u>DENIED</u>.  The parties will jointly file a proposed form of final judgment within ten (10) days of the date of this Order.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

[14]  In its response to Open Solutions' motion for summary judgment on this count, Liberty Bay asserts that Open Solutions' "attempt to collect interest on a good faith dispute between the parties" provides an independent basis for the implied covenant claim.  Pl.'s Opp'n at 18.  This allegation is nowhere found in Liberty Bay's Complaint and will not be supplied by the court.